### JOHN SWIFT *v.* GEORGE W. TYSON.

Action in the Circuit Court of New York on a bill of exchange accepted in New York, instituted by the holder, a citizen of the state of Maine. The acceptance and endorsement of the bill were admitted, and the defence was rested on allegations that the bill had been received in payment of a pre-existent debt, and that the acceptance had been given for lands which the acceptor had purchased from the drawer of the bill, to which lands the drawer had no title; and that the quality of the lands had been misrepresented; and the purchaser imposed upon by the fraud of the drawer, and those who were co-owners of the land, and co-operators in the sale. The bill accepted had been received bona fide, and before it was due.

There is no doubt that a bona fide holder of a negotiable instrument for a valuable consideration, without any notice of the facts which implicate its validity as between the antecedent parties, if he takes it under an endorsement made before the same becomes due, holds the title unaffected by those facts; and may recover thereon, although, as between the antecedent parties, the transaction may be without any legal validity.

The holder of negotiable paper, before it is due, is not bound to prove that he is a bona fide holder for a valuable consideration, without notice; for the law will presume that, in the absence of all rebutting proof: and therefore it is incumbent on a defendant, to establish by way of defence satisfactory proofs of the contrary, and thus to over-come the prima facie title of the plaintiff.

The thirty-fourth section of the judiciary act of 1789, which declares, "That the laws of the several states, except where the Constitution, treaties, or statutes of the United States shall otherwise recognise or provide, shall be regarded as rules of decision in trials at common law in the Courts of the United States, in cases where they apply," has uniformly been supposed by the Supreme Court to be limited in its application to state laws strictly local: that is to say, to the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to

things having a permanent locality, such as the rights and titles to real estates, and other matters immovable and intraterritorial in their nature and character. The section does not extend to contracts or other instruments of a commercial nature; the true interpretation and effect whereof are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence.

ON a certificate of division from the Circuit Court of the United States for the Southern District of New York.

This action was instituted in the Circuit Court upon a bill of exchange, dated at Portland, in the state of Maine, on the first day of May, 1836, for one thousand five hundred and thirty-six dollars and thirty cents, payable six months after date, drawn by Nathaniel Norton, and Jairus S. Keith, upon and accepted by the defendant, the bill having been drawn to the order of Nathaniel Norton, and by him endorsed to the plaintiff. The principal and interest on the bill, up to the time of trial, amounted to one thousand eight hundred and sixty-two dollars and six cents. The defence to the action rested on the answers to a bill of discovery filed by the defendant against the plaintiff; by which it appeared that the bill had been received by him from Nathaniel Norton, with another draft of the same amount in payment of a protested note drawn by Norton and Keith, and which had been paid by him to the Maine Bank. When the draft was received by the plaintiff, it had been accepted by the defendant, who resided in New York. The plaintiff had no knowledge of the consideration which had been received for the acceptance, and had no other transaction with the defendant. He had received the drafts and acceptances in payment of the protested note, with a full belief that the same were justly due, according to their tenor; and he had no other security for the payment of the protested note except the drafts, nor had he any knowledge of any contract or dealing between the defendant and Norton, out of which the said draft arose.

The defendant then offered to prove that the bill of exchange was accepted by him as part consideration for the purchase of certain lands in the state of Maine, of which Keith and Norton, the drawers of the bill, represented themselves to be the owners, and represented them to be of great value, made certain estimates

of them which were warranted by them to be correct, and also contracted to convey a good title to the land; all of which representations were in every respect fraudulent and false; and that said Keith and Norton have never been able to make a title to the lands: whereupon the plaintiff, by his counsel, objected to the admission of said testimony, or any testimony, as against the plaintiff, impeaching or showing the failure of the consideration on which said bill was accepted, under the facts aforesaid admitted by the defendant, and those proven by him, by reading said answers in equity of the plaintiff in evidence. And the judges of the Court divided in opinion on the point or question of law, whether, under the facts last mentioned, the defendant was entitled to the same defence to the action as if the suit was between the original parties to the bill, that is to say, the said Norton, or the said Norton and Keith, and the defendant. And whether the evidence so offered in defence and objected to was admissible as against the plaintiffs in this action.

And thereupon the said point or question of law was, at the request of the counsel for the said plaintiff, stated as above under the direction of the judges of this Court, to be certified under the seal of this Court to the Supreme Court of the United States, at the next session thereof to be held thereafter; to be finally decided by the said last mentioned Court.

The case was submitted to the Court on printed arguments by Mr. Fessenden, for the plaintiff; and by Mr. Dana, for the defendant.

Mr. Fessenden argued, that the defence offered and objected to is no defence as against the plaintiff in this action. The right of the plaintiff to recover, resting, in the first place, on admissions and proof, is established prima facie. The defendant, by his course of proceeding, has admitted: First, that the bill in suit was endorsed to the plaintiff during its course, as negotiable paper, about five months before it became due, according to its tenor.

Second, That when it was received by the plaintiff, he had no notice, or knowledge, or intimation of any fact to the dishonour of the bill; on the contrary, he was assured by his debtor it would

be paid promptly at maturity, and that previous acceptances given in payment of the sale of land had been paid at maturity.

Third, That the acceptance was taken in payment of a pre-existent debt, and that the plaintiff had no other security for the debt due to him by Norton and Keith but this acceptance, and an acceptance of the same character for the residue of his claim on Norton and Keith; and that on receiving the acceptance he had given up the note of Norton and Keith, which had been endorsed by one Child.

By the cases of Bank of Salina v. Babcock and others, 21 Wendell, 499, and Bank of Sandusky v. Scoville and others, 24 Wendell, 115, it distinctly appears, that the latest opinion of the Supreme Court of New York is,—and seemingly as if that Court had never decided otherwise,—that receiving negotiable paper in payment of an antecedent debt, is the same thing, in all respects, as regards the rights of the recipient endorsee of such paper, as if he had paid money, or any other valuable consideration for it, at the time, on the credit of the paper.

But if these cases cannot be reconciled with the plaintiff Swift's side of the present question, are they, unsustained as they are by like decisions in any other of the states in this Union; resting, as they do, on an obvious misinterpretation of the case of Coddington and Bay; and contradicting, as they do, the earlier decision of the same Court on the very point, in the case of Warren and Lynch, which has been referred to; and tending, as they do, to drive commercial negotiable paper out of one of the paths of its greatest utility—are they still to overthrow the decisions of this Court in the cases of Coolidge and Payson, and Townsley and Sumrall? It is contended, on the part of the defendant, that they are, and that this high Court is bound to follow them with unreasoning submission, because the bill in question was drawn on the city of New York, in the state of New York; and on account of the thirty-fourth section of the judiciary act of 1789, which provides, that "the laws of the several states, except where the Constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision, in trials at common law in cases where they apply."

In answer to this, it is urged that, in the first place, after ob-

serving that it is not pretended that the decisions of the Supreme Court of New York referred to, are founded on, or are in exposition of, the constitution or any statute of that state, that the phrase "laws of the several states," in the thirty-fourth section of the judiciary act, means nothing else than the written constitutional system and statutes of such states; and that, if the framers of the act of Congress had not known that all the states had such written constitutions of government laws of paramount authority in those states; and had not wished to frame their enactments in language popular and comprehensive, as well as accurate, they would have used the word "statutes," the appropriate technical word for laws framed by the legislature, instead of the word "laws." If they had intended to embrace in the section the traditionary, or otherwise derived common law of such states, as expounded by the decisions of the state Courts; being, as they were, scholars as well as lawyers, they would have incorporated in the section, by way of substitute or addition, some such general phrase as "systems of law." In common parlance, the word "laws," in the plural, means, and did mean in 1789, legislative enactments. The same word also embraces, popularly and technically, when speaking of the regulations of the respective United States, their constitutions of government, as well as their legislative enactments; and the former, as well as the latter, were doubtless intended to be included in the thirty-fourth section. For these reasons the word "laws," instead of the word "statutes," makes part of the section.

It is admitted that if the bill had been delivered to the plaintiff by Norton for value delivered to him, Norton, at the time on the strength or credit of the bill, the defence should be rejected.

But it is contended on the part of the defendant, that inasmuch as the bill was received by the plaintiff in payment, though it were absolute payment of a pre-existing debt; and though he has no evidence of, or security for, such debt, except the new security in his hands, received in payment of the old; the bill in question was not endorsed to him in the usual course of trade, so as to give him any rights as the holder of it, different from those of the person who transferred it to him; however he may have received it fairly and in good faith, and without notice of any thing which would disenable the party transferring it to him, to

A 2

recover it of the acceptor—and however the fact may be as to its original lawfulness. This is the question for the court to decide: and it is contended, that the bill being so transferred and received in payment of a pre-existing debt, gives the endorsee. all the rights as against the acceptor which he would have had, if, at the time he received it, he had paid the amount of it, in money, to the endorser.

It certainly should be so. The use of negotiable paper has hardly been of greater service to civilized man, in facilitating the transmission of the equivalent of money, and thus in answering, in some respects, the purposes of money itself, than in preventing hostile proceedings in courts of law for the collection of money due. Indeed, one of the principal good effects of the former is, that it tends to prevent suits at law. In point of fact, thousands of suits have been prevented by receiving a bill of exchange or promissory note, with an additional name upon it, payable at a future day, in discharge of a debt, which, although due, the debtor at the moment could discharge in no other way. But if it comes to be settled by law, that the creditor upon such an occasion, must, at his peril, ascertain that the additional party, whose name is upon the paper, has no good defence to its payment as against the person proposing to transfer it to such creditor, it will deter him from receiving it, in lieu of the money he demands; and will, in many instances, lead to suits, which otherwise would not have been commenced.

This high Court has once and again decided the very question involved in this case, in the case of Coolidge et al. *v.* Payson et al., 2 Wheaton, 66 to 73, and in Townsley *v.* Sumrall, 2 Peters, 170 to 180.

The general rule as to negotiable paper is, that where it is not unlawful and void in its inception, he to whom it is transferred while current, in due form, and who receives it in good faith, and for a valuable consideration, without notice of any thing which would exonerate the maker or acceptor of it from paying it to the one from whom he receives it, can recover its amount from such maker or acceptor, although the party from whom he received it could not. Lord Raymond, 738; 1 Salkeld, 126; 3 Salkeld, 71; Grant *v.* Vaughan, 3 Burrows, 1516. But surely the discharge of a just debt is a valuable consideration. Comyn's

Digest, New York ed. of 1824, vol. 1, page 300, title, "Action on the Case upon Assumpsit," B. 3, "Discharge of a debt a good consideration to raise an assumpsit." In Baker v. Arnold, 3 Caines' Rep. 279, it was decided by the Supreme Court of New York, that in an action by the endorsee of a note, not void in its creation, and endorsed before it became due, the consideration, as between the previous parties to the note, could not be inquired into. In Russell v. Ball, 2 Johns. Rep. 50, a decision upon similar principles will be found. Cited, also, Warren v. Lynch, 5 Johns. 339.

But it is contended on the part of the defendant, that later decisions by the Supreme Court of New York have established an opposite principle; and that receiving a note in payment of a preexisting debt is not receiving it in the usual course of trade, nor on a consideration which gives the endorsee any rights on the paper beyond those of the endorser

The phrase, "usual course of trade," is rather vague and indefinite. It was once the usual course of trade to pay debts, and it should still be so. Most of the notes discounted at banks are given for the renewal of notes to fall due, or for the payment of pre-existing debts.

The later decisions of the Supreme Court of New York, referred to, are professedly founded on principles alleged to be decided in the case of Bay v. Coddington, 5 Johns. Chancery Rep. 54, and the same case under the name of Coddington v. Bay, decided in the Court for the Correction of Errors of that state, on appeal. 20 Johns. Rep. 637. This case does not sustain the position of the defendant. It was decided by Chancellor Kent expressly on the ground that "the defendant did not receive the notes in the course of business," nor in payment in part or in the whole of any then existing debt. In the Court for the Correction of Errors the decision of Chancellor Kent was affirmed. In the case of Ward et al. v. Howell, 9 Wend. 170, the note was not received in payment, but as a security. The other cases referred to, Rowsa v. Botherson, 10 Wend. 85; Ontario Bank v. Worthington, 12 Wend. 593; and Payne v. Cutler, 13 Wend. 605, are all founded on the principle laid down by Savage, Chief Justice, in the Ontario Bank v. Worthington, "If the plaintiff fails he loses nothing, he is in the same situation as before he took the paper,

and it was his fault if he did not inquire into the value of the paper, and the defence against it; and all the cases assume that the case of Coddington v. Bay, decided what it did not decide.''

Whensoever a person receives a note or bill in payment of a pre-existing debt, he does lose something if he cannot collect the substitute he receives.  He loses the debt.  He does not stand in the same situation as before he took the note or bill.  The same parties holden on the old and extinguished evidence of debt, may be on the new which he receives, and they may not.  If, then, these decisions of the Supreme Court of New York rest essentially on the principle stated by Chief Justice Savage, they are not at war with the law which is contended for in the present case.

For these reasons it is contended that the 34th section of the judiciary act does not render it obligatory upon this Court to disregard its own decisions, and follow those of any Court of the state of New York, upon a general question like the present, not affected by any statute of that state; although the bill of exchange in question was drawn on the city of New York.

But if law is otherwise, it is submitted that the decisions of the highest Court of the state is the Court for the Correction of Errors.  Gelson v. Hoyt, 3 Wheaton, 248.  In the Court of Errors of New York, the decision in Bay v. Coddington, has been spoken of with disapprobation.

If there is any question of law, not local, but widely general in its nature and effects, it is the present question.  It is one in which foreigners, the citizens of different states, in their contests with each other, nay, every nation of the civilized commercial world, are deeply interested.  By all without the United States, this Court is looked to as the judiciary of the whole nation, known as the United States, whose commerce and transactions are as widely diffused as is the use of bills of exchange. The obvious and admitted wisdom of the thirty-fourth section of the judiciary act, in reference to our excellent, but delicate and complex system of government, if the section does not receive the construction contended for, and which it is believed the framers of that act designed, will lose its nature and become folly; and the section will, as it seems, be productive of mischiefs, in the experience and remembrance of which its benefits will be lost sight of, if the principle urged on the part of the defendant shall prevail.

How can this Court preserve its control over the reason and affections of the people of the United States; that control in which its usefulness consists, and which its own untrammelled learning and judgment would enable it naturally to maintain; if its records show that it has decided—as it may be compelled to decide if the construction of the section referred to, advocated on the part of the defendant, is established—the same identical question, arising on a bill of exchange, first one way, and then the other, with vacillating inconsistency? In what light will the judicial character of the United States appear abroad, under such circumstances.

In cases in which the Courts of the Unite.. States have jurisdiction, by the Constitution and laws of the United States, the common mercantile law of the respective states applying to and governing those cases, is as much submitted to the actual consciences and judgments of the minds of the judges who constitute those Courts, to be considered and declared, without respect to the decision of any state Court, as binding authority, as the same law, in cases where the United States Courts have not jurisdiction, is to the best judgment of the state Courts, without respect to the decision of any Court of the United States, as binding authority. Congress, and Congress alone, has power to regulate commerce between the states. But it will be impossible for Congress to regulate commerce between the states, if it be left to state Courts to declare authoritatively in the absence of any statute upon the point, the force, and meaning of, and the right of parties under that most important instrument of such commerce—the bill of exchange; when drawn and held in and by a citizen of one state, and accepted and payable in and by a citizen of another state.

Mr. Dana, for the defendant.

The first part of the argument of Mr. Dana was upon the question, whether the acceptance of the bill of exchange by the defendant having been given in New York, the contract was not to be regulated by the laws of that state. This question was not brought before the Court by the certificate of division, and the discussion of the point by the counsel of the defendant is therefore omitted.

Mr. Dana declined arguing the question whether, by the laws

of the state of New York, the defence set up by the defendant would have been admissible, as he did not suppose it arose, properly, upon the certificate of division.

He thought the judges did not in fact divide upon that point; but, on the contrary, they gave judgment on a case made by the plaintiff, to set aside the verdict for defendant; and upon elaborate examination of all the decisions of the Courts of the state of New York, that the defence was good; and the verdict ought not to be set aside, if the laws of that state applied to the case.

Upon the question whether, by the thirty-fourth section of the judiciary act of 1789, the law of the state of New York must be the rule of decision of this case; he argued, that under the injunctions of the section that "the laws of the several states, except where the Constitution, treaties, or statutes shall otherwise provide or require, shall be regarded as rules of decision in trials at common law in the Courts of the United States, in cases where they apply," imposed on the Supreme Court an obligation, as well to apply the decisions of the Courts of this state, as the statutes, to cases which come before this Court.

It was necessary to adopt some system or code of law for the administration of justice, by the newly-erected Courts of the United States.

These Courts were anomalous in character, created by statute; under the general provision of the Constitution of the United States, limited in jurisdiction to certain subjects; and without rules of decision in the cases that would arise.

To have attempted to create a code of laws by legislative enactment, would have been without present avail to the Courts; and even with the aid of future experience and after years of labour, could not be expected to be perfect.

The alternative was to adopt an existing system of laws. The common law was sufficiently complete, and would have furnished rules of decision for all cases, as well as modes of judicial proceedings; but it would have then been one system of law in the Federal Courts, for the whole United States. It may be questioned whether the law of the place of the contract, although a principle recognised by the common law, would have had effect in reference to the several states. That principle has reference to a foreign contract. But the territorial limit of the jurisdiction of

[Swift *v.* Tyson.]

the Federal Courts would be one country and subject to one law: Wherever within that limit the cause of action might arise, it would be subject to the same administration of law by these Courts when resorted to for the purpose of enforcing the right.

This would have led to perpetual confliction between the state and Federal Courts.

Another objection would be, that the common law, however perfect in its structure, still had many peculiarities not adapted to the condition of things in this country, and requiring to be modified to meet the exigencies of an enterprising people. Such modification had in fact taken place in all the states, in all of which, at least those having an English origin, the common law had been adopted or rather inherited. Instead therefore of the entire body of the common law, with all its peculiarities, it could be adopted as modified by the states, and by so doing, the Federal Courts would be made to harmonize with the state tribunals, and the law of the place of contract be preserved.

If the phraseology of the section in question be examined with reference to the whole subject that Congress was to provide for, it will be found substantially to express all that was necessary for the adoption of the state laws to the extent and for the purpose we have supposed to have been had in view. It is all the provision there is upon the subject; and in so far as it falls short of the adoption of laws for the direction of the Courts, the defect is still unprovided for. The common law has never been otherwise adopted, nor have the Courts power to create or adopt laws—they must administer the law as existing.

In support of this position it would be sufficient perhaps to refer to the cases of The United States *v.* Worrall, 2 Dallas, 384; The United States *v.* Burr, (opinion delivered by the Chief Justice, Sept. 3d, 1807;) The United States *v.* Hudson and Goodwin, 7 Cranch, 32; The United States *v.* Coolidge, 1 Wheaton, 415.

In these cases, it is true, the question was, whether the Courts of the United States had jurisdiction of crimes and offences at common law, which had not been provided for by the Constitution or laws of the United States; but they involved the general question, whether the common law had been adopted: for if it could be referred to at all, it was equally a source of jurisdiction as it would be the rule of decision. Accordingly, in the discussion

of the question, it was thought necessary to assume, in the utmost latitude, that the common law was the basis of our federal jurisprudence, as it was of the several states; and the decision ought to be regarded as coextensive with the ground upon which the jurisdiction was asserted, and to have finally disposed of it.

Yet, as the Court were not unanimous, and the subject has been since debated with much learning and zeal by distinguished writers, (see Duponceau on the Jurisdiction of the Courts of the United States; 1 Kent's Commentaries, 311, 322; North American Review, July No., 1825; 1 Story's Commentaries on the Constitution, 141;) it may not be supererogatory to examine it anew; as the question is now presented in a form that calls for a specific and final decision of the whole matter.

It would seem to be a self-evident proposition, that the adoption of the common law must have been by the Constitution or legislative enactment. Surely, the Courts could not of their own authority establish as the law of the land, a foreign code or system, no matter how consonant with our political character, or how familiar its principles. By the same authority they could as well have adopted the civil law as existing in France or Holland as the English law.

But, although it is conceded that there is no express recognition or adoption of the common law, either in the Constitution or laws of the United States; it is contended that the Constitution presupposes, and is predicated upon the existence of the common law. Justice Story, in The United States v. Coolidge, 1 Gal. 448; Bayard's Speech, Debates on the Judiciary in 1802, p. 372; North American Review, before cited.

Mr. Justice Story refers to the provisions in the Constitution and laws, in respect to trial by jury, the writ of habeas corpus, &c., as instances when recourse must be had to the common law for the interpretation of terms. 1 Gal. 488.

These observations are just—but what is the conclusion therefrom? Because we have used the terms, have we thereby appropriated the entire common law, and become subject to its authority? Do we not borrow terms in science and arts, without being pledged to the principles to which they may have been applied? The physician derives his nomenclature from the Greek language; but is his practice controlled by the false notions which

those terms often indicate, or the theories of those who invented them? The common law itself has borrowed terms of pleadings and processes and familiar proverbs from the civil law, but do we ook to the original for any supposed obligation? Our law idiom is essentially of common law origin, yet not foreign. It is the language familiar to us in the jurisprudence of the respective states. It is there assimilated and modified by our own circumstances and usages. In coming together from the respective states, the framers of the Constitution, and our representatives in Congress after them, must be regarded as having had in view the language, laws, and institutions of the states which they represented. If, therefore, in the organization of the federal judiciary, a system of laws is presupposed, it is the American law, which is now as distinct in its character as the English or French; yet, as it is not uniform in the states, the adoption of it in the Federal Courts would be necessarily subject to some legislative provision, as to the cases and circumstances to which the law should be applicable. The general language of the law would, however, obviously occur, and be used in any legislation upon the subject, without the necessity of definition as might be required, if some foreign code or any of its provisions were to be transferred and appropriated, like the Athenian law, which was transmuted in a mass by the Romans, into the twelve tables.

But it is said that some of the provisions of the Constitution can take effect only by recourse to the common law, as the clause in article 3, section 2, extending the judicial power to all cases in law and equity, arising under the Constitution, &c., and to admiralty and maritime jurisdiction. The laws and practices of the states, it is argued, cannot be referred to here, because in many of them no equity jurisprudence existed, and the maritime law of the states is supposed to have been too imperfect and unsettled to furnish any basis for that department of law. 1 Gal. 488.

To this it may be answered, that although in some of the states there were no equity tribunals distinct from the common law Courts, yet the principles of equity, as distinguished from those of common law, were perfectly understood in every state, and were in fact administered, although in some of them without the aid of a Court of Chancery. The present organization of the Federal Courts in fact conforms with the usage of those very

states where this defect of equity power is supposed to exist
there is an equity jurisprudence fully carried into effect, without
separate Courts of Equity.

As to the maritime jurisdiction and course of proceeding, it
was sufficiently settled; for the proceedings of our Courts in the
exercise of that jurisdiction, are regulated now, not by the Eng-
lish admiralty law, but by the practice in our own country,
engrafted on the English. 10 Wheaton, 473.

Mr. Dana cited the debates on the Constitution of the United
States in the Convention of Virginia and in other states to show
that without the aid of a statute the common law cannot be called
in aid of the jurisdiction of the Courts, or for rules of decision as
to the necessity of legislation for the authority and manner of
proceeding in the Courts of the United States; he cited the opi-
nion of Mr. Justice Iredell in Chisholm's Executors v. The State
of Georgia, 2 Dallas, 432. That the provisions of the twenty-
fourth section are not confined to "statutes," he cited, as decided
in this Court, Jackson v. Chew, 12 Wheaton, 153; Henderson
and wife v. Griffin, 5 Peters, 151; Green v. Neal, 6 Peters, 291;
The United States v. Wanson, 1 Gallison, 5; Van Reimsdyke v.
Kine et al., 1 Gallison, 371.

Mr. Justice STORY delivered the opinion of the Court.

This cause comes before us from the Circuit Court of the south-
ern district of New York, upon a certificate of division of the
judges of that Court.

The action was brought by the plaintiff, Swift, as endorsee, against
the defendant, Tyson, as acceptor, upon a bill of exchange dated at
Portland, Maine, on the first day of May, 1836, for the sum of
one thousand five hundred and forty dollars, thirty cents, payable
six months after date and grace, drawn by one Nathaniel Norton
and one Jairus S. Keith upon and accepted by Tyson, at the city
of New York, in favour of the order of Nathaniel Norton, and
by Norton endorsed to the plaintiff. The bill was dishonoured
at maturity.

At the trial the acceptance and endorsement of the bill were
admitted, and the plaintiff there rested his case. The defendant
then introduced in evidence the answer of Swift to a bill of dis-
covery, by which it appeared that Swift took the bill before it

became due, in payment of a promissory note due to him by Norton and Keith; that he understood that the bill was accepted in part payment of some lands sold by Norton to a company in New York; that Swift was a bonâ fide holder of the bill, not having any notice of any thing in the sale or title to the lands, or otherwise, impeaching the transaction, and with the full belief that the bill was justly due. The particular circumstances are fully set forth in the answer in the record; but it does not seem necessary farther to state them. The defendant then offered to prove, that the bill was accepted by the defendant as part consideration for the purchase of certain lands in the state of Maine, which Norton and Keith represented themselves to be the owners of, and also represented to be of great value, and contracted to convey a good title thereto; and that the representations were in every respect fraudulent and false, and Norton and Keith had no title to the lands, and that the same were of little or no value. The plaintiff objected to the admission of such testimony, or of any testimony, as against him, impeaching or showing a failure of the consideration, on which the bill was accepted, under the facts admitted by the defendant, and those proved by him, by reading the answer of the plaintiff to the bill of discovery. The judges of the Circuit Court thereupon divided in opinion upon the following point or question of law; Whether, under the facts last mentioned, the defendant was entitled to the same defence to the action as if the suit was between the original parties to the bill; that is to say, Norton, or Norton and Keith, and the defendant; and whether the evidence so offered was admissible as against the plaintiff in the action. And this is the question certified to us for our decision.

There is no doubt, that a bonâ fide holder of a negotiable instrument for a valuable consideration, without any notice of facts which impeach its validity as between the antecedent parties, if he takes it under an endorsement made before the same becomes due, holds the title unaffected by these facts, and may recover thereon, although as between the antecedent parties the transaction may be without any legal validity. This is a doctrine so long and so well established, and so essential to the security of negotiable paper, that it is laid up among the fundamentals of the law, and requires no authority or reasoning to be now brought

in its support. As little doubt is there, that the holder of any negotiable paper, before it is due, is not bound to prove that he is a bonâ fide holder for a valuable consideration, without notice; for the law will presume that, in the absence of all rebutting proofs, and therefore it is incumbent upon the defendant to establish by way of defence satisfactory proofs of the contrary, and thus to overcome the primâ facie title of the plaintiff.

In the present case, the plaintiff is a bonâ fide holder without notice for what the law deems a good and valid consideration, that is, for a pre-existing debt; and the only real question in the cause is, whether, under the circumstances of the present case, such a pre-existing debt constitutes a valuable consideration in the sense of the general rule applicable to negotiable instruments. We say, under the circumstances of the present case, for the acceptance having been made in New York, the argument on behalf of the defendant is, that the contract is to be treated as a New York contract, and therefore to be governed by the laws of New York, as expounded by its Courts, as well upon general principles, as by the express provisions of the thirty-fourth section of the judiciary act of 1789, ch. 20. And then it is further contended, that by the law of New York, as thus expounded by its Courts, a pre-existing debt does not constitute, in the sense of the general rule, a valuable consideration applicable to negotiable instruments.

In the first place, then, let us examine into the decisions of the Courts of New York upon this subject. In the earliest case, Warren *v.* Lynch, 5 Johns. R. 289, the Supreme Court of New York appear to have held, that a pre-existing debt was a sufficient consideration to entitle a bonâ fide holder without notice to recover the amount of a note endorsed to him, which might not, as between the original parties, be valid. The same doctrine was affirmed by Mr. Chancellor Kent in Bay *v.* Coddington, 5 Johns. Chan. Rep. 54. Upon that occasion he said, that negotiable paper can be assigned or transferred by an agent or factor or by any other person, fraudulently, so as to bind the true owner as against the holder, provided it be taken in the usual course of trade, and for a fair and valuable consideration without notice of the fraud. But he added, that the holders in that case were not entitled to the benefit of the rule, because it was not negotiated to

[Swift *v.* Tyson.]

them in the usual course of business or trade, nor in payment of any antecedent and existing debt, nor for cash, or property advanced, debt created, or responsibility incurred, on the strength and credit of the notes; thus directly affirming, that a pre-existing debt was a fair and valuable consideration within the protection of the general rule. And he has since affirmed the same doctrine, upon a full review of it, in his Commentaries, 3 Kent. Comm. sect. 44, p. 81. The decision in the case of Bay *v.* Coddington was afterwards affirmed in the Court of Errors, 20 Johns. R. 637, and the general reasoning of the chancellor was fully sustained. There were indeed peculiar circumstances in that case, which the Court seem to have considered as entitling it to be treated as an exception to the general rule, upon the ground either because the receipt of the notes was under suspicious circumstances, the transfer having been made after the known insolvency of the endorser; or because the holder had received it as a mere security for contingent responsibilities, with which the holders had not then become charged. There was, however, a considerable diversity of opinion among the members of the Court, upon that occasion, several of them holding that the decree ought to be reversed, others affirming that a pre-existing debt was a valuable consideration, sufficient to protect the holders, and others again insisting, that a pre-existent debt was not sufficient. From that period, however, for a series of years, it seems to have been held by the Supreme Court of the state, that a pre-existing debt was not a sufficient consideration to shut out the equities of the original parties in favour of the holders. But no case to that effect has ever been decided in the Court of Errors. The cases cited at the bar, and especially Roosa *v.* Brotherson, 10 Wend. R. 85; The Ontario Bank *v.* Worthington, 12 Wend. R. 593; and Payne *v.* Cutler, 13 Wend. R. 605, are directly in point. But the more recent cases, The Bank of Salina *v.* Babcock, 21 Wend. R. 490, and The Bank of Sandusky *v.* Scoville, 24 Wend. R. 115, have greatly shaken, if they have not entirely overthrown those decisions, and seem to have brought back the doctrine to that promulgated in the earliest cases. So that, to say the least of it, it admits of serious doubt, whether any doctrine upon this question can at the present time be treated as finally established; and it is certain,

B 2        3

that the Court of Errors have not pronounced any positive opinion upon it.

But, admitting the doctrine to be fully settled in New York, it remains to be considered, whether it is obligatory upon this Court, if it differs from the principles established in the general commercial law. It is observable that the Courts of New York do not found their decisions upon this point upon any local statute, or positive, fixed, or ancient local usage : but they deduce the doctrine from the general principles of commercial law. It is, however, contended, that the thirty-fourth section of the judiciary act of 1789, ch. 20, furnishes a rule obligatory upon this Court to follow the decisions of the state tribunals in all cases to which they apply. That section provides " that the laws of the several states, except where the Constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the Courts of the United States, in cases where they apply." In order to maintain the argument, it is essential, therefore, to hold, that the word " laws," in this section, includes within the scope of its meaning the decisions of the local tribunals. In the ordinary use of language it will hardly be contended that the decisions of Courts constitute laws. They are, at most, only evidence of what the laws are ; and are not of themselves laws. They are often re-examined, reversed, and qualified by the Courts themselves, whenever they are found to be either defective, or ill-founded, or otherwise incorrect. The laws of a state are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long established local customs having the force of laws. In all the various cases which have hitherto come before us for decision, this Court have uniformly supposed, that the true interpretation of the thirty-fourth section limited its application to state laws strictly local, that is to say, to the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intraterritorial in their nature and character. It never has been supposed by us, that the section did apply, or was designed to apply, to questions of a more general nature; not at all dependent upon local statutes or

[Swift *v.* Tyson.]

local usages of a fixed and permanent operation, as, for example, to the construction of ordinary contracts or other written instruments, and especially to questions of general commercial law, where the state tribunals are called upon to perform the like functions as ourselves, that is, to ascertain upon general reasoning and legal analogies, what is the true exposition of the contract or instrument, or what is the just rule furnished by the principles of commercial law to govern the case. And we have not now the slightest difficulty in holding, that this section, upon its true intendment and construction, is strictly limited to local statutes and local usages of the character before stated, and does not extend to contracts and other instruments of a commercial nature, the true interpretation and effect whereof are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence. Undoubtedly, the decisions of the local tribunals upon such subjects are entitled to, and will receive, the most deliberate attention and respect of this Court; but they cannot furnish positive rules, or conclusive authority, by which our own judgments are to be bound up and governed. The law respecting negotiable instruments may be truly declared in the language of Cicero, adopted by Lord Mansfield in Luke *v.* Lyde, 2 Burr. R. 883, 887, to be in a great measure, not the law of a single country only, but of the commercial world. Non erit alia lex Romæ, alia Athenis, alia nunc, alia posthac, sed et apud omnes gentes, et omni tempore, una eademque lex obtenebit.

It becomes necessary for us, therefore, upon the present occasion to express our own opinion of the true result of the commercial law upon the question now before us. And we have no hesitation in saying, that a pre-existing debt does constitute a valuable consideration in the sense of the general rule already stated, as applicable to negotiable instruments. Assuming it to be true, (which, however, may well admit of some doubt from the generality of the language,) that the holder of a negotiable instrument is unaffected with the equities between the antecedent parties, of which he has no notice, only where he receives it in the usual course of trade and business for a valuable consideration, before it becomes due; we are prepared to say, that receiving it in payment of, or as security for a pre-existing debt,

is according to the known usual course of trade and business. And why upon principle should not a pre-existing debt be deemed such a valuable consideration? It is for the benefit and convenience of the commercial world to give as wide an extent as practicable to the credit and circulation of negotiable paper, that it may pass not only as security for new purchases and advances, made upon the transfer thereof, but also in payment of and as security for pre-existing debts. The creditor is thereby enabled to realize or to secure his debt, and thus may safely give a prolonged credit, or forbear from taking any legal steps to enforce his rights. The debtor also has the advantage of making his negotiable securities of equivalent value to cash. But establish the opposite conclusion, that negotiable paper cannot be applied in payment of or as security for pre-existing debts, without letting in all the equities between the original and antecedent parties, and the value and circulation of such securities must be essentially diminished, and the debtor driven to the embarrassment of making a sale thereof, often at a ruinous discount, to some third person, and then by circuity to apply the proceeds to the payment of his debts. What, indeed, upon such a doctrine would become of that large class of cases, where new notes are given by the same or by other parties, by way of renewal or security to banks, in lieu of old securities discounted by them, which have arrived at maturity? Probably more than one-half of all bank transactions in our country, as well as those of other countries, are of this nature. The doctrine would strike a fatal blow at all discounts of negotiable securities for pre-existing debts.

This question has been several times before this Court, and it has been uniformly held, that it makes no difference whatsoever as to the rights of the holder, whether the debt for which the negotiable instrument is transferred to him is a pre-existing debt, or is contracted at the time of the transfer. In each case he equally gives credit to the instrument. The cases of Coolidge v. Payson, 2 Wheaton, R. 66, 70, 73, and Townsley v. Sumrall, 2 Peters, R. 170, 182, are directly in point.

In England the same doctrine has been uniformly acted upon. As long ago as the case of Pillans and Rose v. Van Meirop and Hopkins, 3 Burr. 1664, the very point was made and the objection was overruled. That, indeed, was a case of far more stringency

than the one now before us; for the bill of exchange, there drawn in discharge of a pre-existing debt, was held to bind the party as acceptor, upon a mere promise made by him to accept before the bill was actually drawn. Upon that occasion Lord Mansfield, likening the case to that of a letter of credit, said, that a letter of credit may be given for money already advanced, as well as for money to be advanced in future : and the whole Court held the plaintiff entitled to recover. From that period downward there is not a single case to be found in England in which it has ever been held by the Court, that a pre-existing debt was not a valuable consideration, sufficient to protect the holder, within the meaning of the general rule, although incidental dicta have been sometimes relied on to establish the contrary, such as the dictum of Lord Chief Justice Abbott in Smith v. De Witt, 6 Dowl. & Ryland, 120, and De la Chaumette v. The Bank of England, 9 Barn. & Cres. 209, where, however, the decision turned upon very different considerations.

Mr. Justice Bayley, in his valuable work on bills of exchange and promissory notes, lays down the rule in the most general terms. "The want of consideration," says he, "in toto or in part, cannot be insisted on, if the plaintiff or any intermediate party between him and the defendant took the bill or note bona fide and upon a valid consideration." Bayley on Bills, p. 499, 500, 5th London edition, 1830. It is observable that he here uses the words "valid consideration," obviously intending to make the distinction, that it is not intended to apply solely to cases, where a present consideration for advances of money on goods or otherwise takes place at the time of the transfer and upon the credit thereof. And in this he is fully borne out by the authorities. They go farther, and establish, that a transfer as security for past, and even for future responsibilities, will, for this purpose, be a sufficient, valid, and valuable consideration. Thus, in the case of Bosanquet v. Dudman, 1 Starkie, R. 1, it was held by Lord Ellenborough, that if a banker be under acceptances to an amount beyond the cash balance in his hands, every bill he holds of that customer's, bona fide, he is to be considered as holding for value; and it makes no difference though he hold other collateral securities, more than sufficient to cover the excess of his acceptances.

The same doctrine was affirmed by Lord Eldon in Ex parte Bloxham, 8 Ves. 531, as equally applicable to past and to future acceptances. The subsequent cases of Heywood *v.* Watson, 4 Bing. R. 496, and Bramah *v.* Roberts, 1 Bing. New Ca. 469, and Percival *v.* Frampton, 2 Cromp. Mees. & Rose, 180, are to the same effect. They directly establish that a bonâ fide holder, taking a negotiable note in payment of or as security for a pre-existing debt, is a holder for a valuable consideration, entitled to protection against all the equities between the antecedent parties. And these are the latest decisions, which our researches have enabled us to ascertain to have been made in the English Courts upon this subject.

In the American Courts, so far as we have been able to trace the decisions, the same doctrine seems generally but not universally to prevail. In Brush *v.* Scribner, 11 Conn. R. 388, the Supreme Court of Connecticut, after an elaborate review of the English and New York adjudications, held, upon general principles of commercial law, that a pre-existing debt was a valuable consideration, sufficient to convey a valid title to a bonâ fide holder against all the antecedent parties to a negotiable note. There is no reason to doubt, that the same rule has been adopted and constantly adhered to in Massachusetts; and certainly there is no trace to be found to the contrary. In truth, in the silence of any adjudications upon the subject, in a case of such frequent and almost daily occurrence in the commercial states, it may fairly be presumed, that whatever constitutes a valid and valuable consideration in other cases of contract to support titles of the most solemn nature, is held à fortiori to be sufficient in cases of negotiable instruments, as indispensable to the security of holders, and the facility and safety of their circulation. Be this as it may, we entertain no doubt, that a bonâ fide holder, for a pre-existing debt, of a negotiable instrument, is not affected by any equities between the antecedent parties, where he has received the same before it became due, without notice of any such equities. We are all, therefore, of opinion, that the question on this point, propounded by the Circuit Court for our consideration, ought to be answered in the negative; and we shall accordingly direct it so to be certified to the Circuit Court.

[Swift v. Tyson.]

Mr. Justice CATRON said:

Upon the point of difference between the judges below, I concur, that the extinguishment of a debt, and the giving a post consideration, such as the record presents, will protect the purchaser and assignee of a negotiable note from the infirmity affecting the instrument before it was negotiated. But I am unwilling to sanction the introduction into the opinion of this Court, a doctrine aside from the case made by the record, or argued by the counsel, assuming to maintain, that a negotiable note or bill pledged as collateral security for a previous debt, is taken by the creditor in the due course of trade; and that he stands on the foot of him who purchases in the market for money, or takes the instrument in extinguishment of a previous debt. State Courts of high authority on commercial questions have held otherwise; and that they will yield to a mere expression of opinion of this Court, or change their course of decision in conformity to the recent English cases referred to in the principal opinion, is improbable: whereas, if the question was permitted to rest until it fairly arose, the decision of it either way by this Court, probably, would, and I think ought to settle it. As such a result is not to be expected from the opinion in this cause, I am unwilling to embarrass myself with so much of it as treats of negotiable instruments taken as a pledge. I never heard this question spoken of as belonging to the case, until the principal opinion was presented last evening; and therefore I am not prepared to give any opinion, even was it called for by the record.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the southern district of New York, and on the point and question on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this Court for its opinion, agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this Court, that the defendant was not, under the facts stated, entitled to the same defence to the action as if the suit was between the original parties to the bill; that is to say, the said Norton, or the said Norton and Keith and the defendant: and that the evidence

offered in defence and objected to, was not admissible as against the plaintiff in this action.   Whereupon it is now here ordered and adjudged by this Court, that an answer in the negative be certified to the said Circuit Court.