Cecil F. Poole, U. S. Atty., San Francisco, Cal., with Peter V. Shackter, Asst. U. S. Atty., appearing for plaintiff.

Charles E. Cooper and Theodore Sachsman, San Francisco, Cal., for defendant and third-party plaintiff.

**UNITED STATES of America,**
**Plaintiff,**

v.

**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Defendant and Third-Party Plaintiff,**

v.

**John Raymond SHERRETT and Ronald Wayne Reed, Third-Party Defendants.**

**No. 47431.**

United States District Court
N. D. California.

July 24, 1968.

## MEMORANDUM OPINION

ALBERT C. WOLLENBERG, District Judge.

This is an action by the United States against the Bank of America to recover the proceeds of six Treasury checks presented by the Bank to the plaintiff as issuer and drawee and paid by the Government to the Bank. The Government's theories of recovery are breach of the Bank's expressed and implied warranty of prior endorsement and payment of money by mutual mistake. The Bank has filed a third party claim against persons who caused the checks to be endorsed and delivered to the Bank.

The facts, as set out in the "Agreed Statement of Facts," prepared by coun-

sel for the Government and Bank, are as follows:

"In 1965 and 1966, third-party defendants Ronald W. Reed and John R. Sherrett were enlisted men in the United States Navy and stationed on board the aircraft carrier USS Coral Sea, which was then in port at San Francisco Bay Naval Shipyard, Hunters Point, California. Both third-party defendants worked in the Disbursing Office. One Gary W. Spiller was also assigned to USS Coral Sea and was discharged January 1, 1966, but actually left the ship December 31, 1965, and was in transit to his point of destination in Bakersfield, California, on January 1, 1966. Spiller had no knowledge of the facts hereinafter stated until he was advised of them by the FBI, subsequent to their occurrence. After Spiller's departure from USS Coral Sea, third-party defendant John R. Sherrett surreptitiously obtained Spiller's identification card and inserted his own photograph in place of Spiller's. Thereafter, third-party defendant Ronald W. Reed made up pay records in favor of Gary W. Spiller, made up the requisite pay receipts and check records, and typed unsigned Treasury checks payable to Gary W. Spiller. The various documents were presented to the Disbursing Officer by either Reed or Sherrett on both regular and special payrolls, and the authorized Disbursing Officer, one Ensign James Lipsett, signed the checks and gave them back to the man who presented them, to give to Spiller. At all times, Reed and Sherrett intended those events to occur, which did, in fact, occur; that because of the operation of their conspiracy as herein set forth Spiller would not receive any proceeds of the checks. Both Reed and Sherrett were known personally to Lipsett and Lipsett had no reason, from their past conduct, to believe that they had misbehaved in any way in their duties. It was their regular and authorized job to prepare the documents described in the regular course of business for regular and special payroll; said documents comprised all the documentation necessary for the issuance of said pay checks.

At the signing of each and all of the checks, Ensign Lipsett intended to pay, on behalf of the Government, a definite living person then stationed on board USS Coral Sea to whom the money was lawfully due. The individual presenting the checks, either Reed or Sherrett, represented to Lipsett on the occasion of signing some of the checks that Spiller had reenlisted. Spiller was not known personally to Lipsett; however, on the regular payroll the name appeared with other names personally known to Lipsett. Had Lipsett known the true facts in this matter, he would not have signed the checks. The checks thus issued were dated, numbered and in the amounts as follows:

| DATE | AMOUNT | NUMBER |
| --- | --- | --- |
| 4 Feb 1966 | $ 552.00 | 35578 |
| 15 Feb 1966 | 181.00 | 35674 |
| 21 Feb 1966 | 1305.00 | 35820 |
| 2 Mar 1966 | 1452.00 | 36069 |
| 15 Mar 1966 | 850.00 | 36219 |
| 22 Mar 1966 | 2332.00 | 36311 |

As to those checks presented to Lipsett by Reed, third-party defendant Reed from time to time gave the checks to third-party defendant Sherrett, following their issuance. Third-party defendant Sherrett took all the checks and presented them at various times at various branches of defendant Bank of America National Trust and Savings Association, after signing the endorsement of Gary W. Spiller thereon. On each occasion the identification card was exhibited to the tellers, who did not observe any reason to suspect Sherrett. Upon receipt of payment, third-party defendant Sherrett split the proceeds with third-party defendant Ronald Reed. The defendant Bank of America endorsed each and all of said checks with an express written guaranty of prior endorsements and presented them to the Treasury through the Federal Reserve Bank. Payment was made by the Government on each of said checks to the defendant Bank of America. Said payment was made without knowledge of the unauthorized signature of

Gary W. Spiller; if said knowledge were had by the Government, payment would not have been made. If payment had not been made, the Bank would have made claim against the Government, alleging itself to be a holder in due course.

"Criminal action No. 40987 was brought in the above-entitled court against third-party defendants Ronald W. Reed and John R. Sherrett and both were convicted upon their pleas of guilty to uttering and publishing as true a falsely made Treasury check. Sentence was suspended as to both defendants, and both were placed on five years probation and ordered to make restitution in the sum of $1166.00, individually. At the present date, third-party defendant Ronald W. Reed has paid only $80.00 on his restitution. Demand was made upon the defendant Bank of America to pay the United States of America the sum of $6672.00 on account of the presentment and payment by the Government of the checks herein described on May 4, 1967, prior to the filing of the present action."

The issue before this Court is whether a federal court should adopt by analogy as "federal Law" Section 3—405(1)(c)[1] of the Uniform Commercial Code, adopted by all but one of the states,[2] in lieu of the "federal law" established by United States Supreme Court in National Metropolitan Bank v. United States, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383 (1945).

In the *Metropolitan Bank* case, a government employee drew up travel and pay vouchers in the name of living military personnel and presented Treasury checks conforming to the vouchers to the disbursing officer for signature. The employee then took the checks, signed the names of the payees as endorsement, signed his name as second endorsement and obtained the proceeds. The bank then presented the checks to the government, who paid the Bank the amount of the checks. The Supreme Court held, under these facts, that its holding in Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) that "[b]reach of [the warranty of prior endorsements] * * * by presenting a check on which the payee's signature is a forgery, gives the government a right to recover from the guarantor when payment is made" (323 U.S. at 456, 65 S.Ct. at 355) controls the outcome of the case. As to the Bank's contention that the affirmative negligence of the Government in failing to discover the fraud ought to preclude relief, the Court applied the general law merchant, which rejected this defense. It noted that this general rule "has been almost unanimously accepted by State and federal courts." It continued, "No persuasive reasons have been suggested to us why it should not be accepted as the general federal rule." 323 U.S. at 457, 65 S.Ct. at 356.

Defendant does not seriously urge that the *Metropolitan Bank* case does not apply to the instant case. What defendant suggests is that the meaning of the *Metropolitan Bank* case is that federal courts must look to the general commercial law at the time of the transaction in fashioning a "federal law." Its argument, simply stated, is that now that 49 states have adopted Section 3—405(1)(c) of the Uniform Commercial Code, that law is the general commercial law and should be followed now by this Court in fashioning a federal rule. Clearly, defendant does not ask that this Court adopt the U.C.C. as such, but rather asks that this Court follow the U.C.C. by analogy.

---

1. U.C.C., Section 3405(1)(c) provides: "(1) An endorsement by any person in the name of a named payee is effective if * * * (c) An agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest."

2. The Code has also been adopted in the District of Columbia and the Virgin Islands. Louisiana, the only state which does not have the U.C.C. does have the amended version of Section 9 of the Uniform Negotiable Instruments Act, which is similar to the U.C.C.

Before evaluating defendant's argument, it is necessary to place the *Clearfield Trust* case in its historical perspective. Prior to that decision, the federal courts in cases involving federal commercial paper followed state law under apparent authority of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). See e. g., United States v. Bank of America, 47 F.Supp. 279 (N.D. Cal.1942). The District Court in the *Clearfield Trust* case had in fact applied the law of Pennsylvania which was to the effect that if the issuer (there, the Government) of the check unreasonably delayed in giving notice of the forgery to the bank, prejudice to the bank would be presumed, and recovery by the Government would be precluded. The Supreme Court held that *Erie* did not apply to cases involving the rights and duties of the United States on its own commercial paper, stating:

> "The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. * * * In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." Clearfield Trust Co. v. United States, 318 U.S. at 366–367, 63 S.Ct. at 575.

The rationale for applying a federal rule in cases involving commercial paper of the United States was succinctly stated by the Court in the following quoted portion from its opinion, 318 U.S. at 367, 63 S.Ct. at 575:

> "In our choice of the applicable federal rule we have occasionally selected state law. See Royal Indemnity Co. v. United States, supra, [313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361.] But reasons which may make state law at times the appropriate federal rule are singularly inappropriate here. The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain. *And while the federal law merchant developed for about a century under the regime of* Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, *represented general commercial law rather than a choice of a federal rule designed to protect a federal right, it nevertheless stands as a convenient source of reference for fashioning federal rules applicable to these federal questions.* [Emphasis supplied].

The Court then went on to discuss the various *federal* cases in this area, and applied a rule of law which would preclude the Government from recovery only if actual prejudice were shown to have resulted to the bank from its delay in giving notice. United States v. National Exchange Bank of Providence, 214 U.S. 302, 29 S.Ct. 665, 53 L.Ed. 1006 (1909).

It is quite clear that the Supreme Court in *Clearfield* was pointing the federal courts in a new direction. Had it only held that *Erie* was inapplicable, the federal courts would have then fallen back on the blind precedents set during the reign of Swift v. Tyson, 16 Pet. 1, 41 U.S. 1, 10 L.Ed. 865 (1842). But the Court went further when it spoke for the first time of the duty of the federal courts to *choose* "a federal rule *designed* to protect a federal right." 318 U.S. at 367, 63 S.Ct. at 575. [Emphasis supplied]. A "convenient source" for this rule would be the "general commercial law" established in the federal cases. 318 U.S. at 367, 63 S.Ct. 573.

Two years later, the *Metropolitan Bank* case was decided, which affirmed the principles set down in *Clearfield Trust*. In light of *Clearfield*, the holding in the

*Metropolitan Bank* case could be interpreted as a *choice* by the Court of a federal rule "designed to protect a federal right", rather than as the adoption by the federal courts of the law existing in the majority of state jurisdictions at that time. However, defendant would have us believe that the holding in the *Metropolitan. Bank* case was simply one in which the Court followed the "majority rule", and now that the "majority rule" has been changed by the U.C.C., this Court ought to feel free to adopt that body of law. Defendant apparently finds support for its position in the Court's statement that the rule followed in the *Metropolitan Bank* case had "been unanimously accepted by State and federal courts." 323 U.S. at 457, 65 S.Ct. at 356.

The language cited above does not lend full support to defendant's argument that in fashioning a federal rule, the only consideration of a federal court is what a majority of the states have adopted. The *Clearfield Trust* doctrine gives a federal court the added function of developing a body of law consonant with those interests which are uniquely federal. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 426, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Hence, the Court in the *Metropolitan Bank* case (the same Court which rendered the *Clearfield Trust* decision two years earlier) was, in addition to citing the majority rule as *support* for its decision, also defining the federal interest in protecting its rights in commercial paper which it issued.

It must be made clear that one of the factors which concerned the Court in *Clearfield* and *Metropolitan Bank* is not present in the instant situation. In both those cases, the Court was concerned with the adverse effect on the federal government of applying different state rules to the same federal transactions. Hence, it stressed the need for uniformity as one reason for adopting a federal rule. Here, section 3—405(1)(c) of the U.C.C. has been adopted by 49 of the 50 states, and its principles are followed by the lone dissenter.[3] If this Court should decide to adopt by analogy the rule announced by the U.C.C., there would be no problem with regard to different rules applying in each jurisdiction, although as the Government points out, the effect of different federal courts applying either the *Metropolitan* holding or the U.C.C. would be disastrous on the quest for uniformity within the federal system.

While the need for uniformity will be met with the adoption of either body of law, this Court still has the duty of determining the federal interest in protecting the government's rights in its commercial paper. We think that the *Clearfield* and *Metropolitan Bank* Court did just that when it determined that the Government should not be precluded from recovering from a presenting bank notwithstanding its affirmative negligence. That Court was well aware of the rule of law which defendant has thrust upon us as is clear by the cases cited in the National Metropolitan Bank's brief. See National Metropolitan Bank v. United States, 65 S.Ct. at 89 L.Ed., at 384. Yet, it chose, as was dictated by *Clearfield Trust*, that the federal interest was best served by allowing the Government to recover. Because the several states have adopted a different rule does not mean that the federal interest, as announced in the *Metropolitan Bank* case, has been since diluted. To the contrary, the federal government is not in the same position as a private person with respect to its control over its employees. The whole rationale behind Section 3—405(1)(c) of the U.C.C., as stated in the Official Comments thereto, is "that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee." The Comment further states: "The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or,

---

3. See Note 2.

if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee." Comment 4 to Section 3—405(1)(c), U.C.C.

As the government points out,

"Reed and Sherrett were enlisted men in the Navy. The Navy is not a business enterprise but is required to be maintained in the interest of national security. Non-commissioned personnel are enlisted into the Navy on a far different basis, and with less opportunity for care in selection, than payroll personnel in a private corporation. Because of the volume of enlisted personnel in the Navy and the rapid turnover in positions, it is not feasible for the Government to maintain character investigatory systems or to cover the loss by fidelity insurance as suggested in the Code commentary. * * It may also be observed that the Government also operates far less profitably than nearly all presenting banks. The business risk rationale is not in point; public moneys need protection more than the presenting bank's assets." Opening Brief for the United States, p. 7.

This Court agrees with the Government's statement. The Government, especially with respect to military personnel, cannot be expected to exercise the same control as private enterprise over its employees. It is noteworthy that in both *Clearfield* and *Metropolitan Bank,* the employees involved were civilian rather than military. If, as both cases impliedly hold, the Government cannot be expected to maintain any meaningful control over its civilian employees, it can hardly be said that it must do so regarding men in the military.

In rejecting defendant's basic contention for the above-stated reasons, this Court is also mindful of its role as an inferior court and of the possible conflicts which would be created among the various Circuits if it accepted defendant's argument, which would have a profound effect on the uniformity desired in this particular area. While there may be some doubt as to the actual reasons for the Supreme Court's rejection of defendant's basic theories in the *Clearfield* and *Metropolitan Bank* cases, only today's Supreme Court can give us the answer and at the same time preserve the uniformity which has existed since *Clearfield.*

Accordingly, for the reasons mentioned in this opinion, plaintiff is entitled to recover against defendant the amount as prayed for with interest. Plaintiff is to have its costs of suit herein, and to prepare an appropriate decree. This opinion shall constitute findings of fact and conclusions of law as is required by the Rules.